UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NORTHWEST OSTEOSCREENING, INC., an Idaho corporation, directly and derivatively in its capacity as a member of IDAHO HEALTH SCREENINGS AND VACCINATIONS, LLC, an Idaho limited liability company, PREVENTATIVE HEALTH, LLC, an Idaho limited liability company, and DANIELLE BENNION,<br><br>                Plaintiffs,<br>  v.<br><br>MOUNTAIN VIEW HOSPTIAL, LLC, a Delaware limited liability company, BENJAMIN WOOD, JAMES ADAMSON, JOSH TOLMAN, SIASCONSET, LLC, an Oregon limited liability company, PREVENTATIVE HEALTH, LLC, a Delaware limited liability company, WELLNESS SCREENINGS, LLC, an Idaho limited liability company, and DOE ENTITIES I – X,<br><br>                Defendants. | Case No. 4:13-cv-00414-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiffs brought suit against Defendants under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and various Idaho laws. Underlying the RICO claims are Plaintiffs' allegations that Defendants committed extortion and wire fraud in order to assume Plaintiffs' interests in a preventative health screening company, Idaho Health Screenings and Vaccinations, LLC ("IHSV").

Defendants move to dismiss Plaintiffs RICO claims for failure to state a claim, and to dismiss the pendant state law claims without prejudice. *See* 28 U.S.C. § 1367(c)(3); *Fed. R. Civ. P.* 12(b)(6). Because Plaintiffs have failed to plead facts establishing an essential element of their substantive RICO claim—a "pattern of racketeering activity"— the Court will grant Defendants' motion to dismiss.

## BACKGROUND

Since about 2001, Plaintiff Danielle Bennion has owned and operated Plaintiff Northwest Osteoscreenings, Inc. ("Northwest Osteo") to offer health screening services, such as blood pressure checks and body mass index calculations, and vaccinations to businesses and government entities in Idaho.[1] Because it was not a "credentialed provider" within the meaning of Idaho insurance regulations and most insurance policies, Northwest Osteo could not bill its patients' insurance providers for the services it performed. Instead, Northwest Osteo billed patients or their employers directly.

---

[1] The facts are taken from plaintiffs' first amended complaint and the documents on which the complaint relies. *See Knievel v. ESPN,* 393 F.3d 1068, 1076 (9th Cir. 2005). The facts are accepted as true for the purposes of this motion to dismiss. *Id.* at 1072.

In January 2011, Bennion joined Defendant Mountain View Hospital, LLC ("MVH") as its director of government affairs. In this capacity, Bennion developed a professional relationship with Defendant James Adamson, the CEO of MVH. Around the same time, a provision of the Affordable Care Act eliminated deductibles, co-insurance, and co-payments from new and existing health insurance plans for many preventative health care services. *See* 42 U.S.C. § 300gg-13(a).

Bennion viewed this change as a business opportunity. She approached Adamson and proposed a collaboration between Northwest Osteo and MVH. Under her plan, Northwest Osteo would perform on-site preventative health services, and MVH, as a "credentialed provider," would bill the patients' insurance providers for the services. The two corporations would split the insurance revenue. Adamson was intrigued by Bennion's proposal.

Together with Defendant Benjamin Wood, an attorney with whom Adamson had a relationship, and Defendant Josh Tolman, MVH's then vice president, Adamson and Bennion moved forward with the proposal. Defendants represented to Bennion that MVH had the staff and expertise necessary to correctly and expediently bill for health screening services and vaccinations. However, to ensure a timely distribution of revenue, Adamson insisted that a new corporation be formed. Adamson assured Bennion that Wood would handle the task because he was licensed in Idaho. On March 28, 2011, Wood formed IHSV for that purpose.

Ownership of IHSV was split. Bennion, through Northwest Osteo, owned a fifty-percent interest in IHSV. Wood, Tolman, and—unbeknownst to Bennion—Adamson owned the remaining fifty-percent interest through a series of corporate members, the last of which was Defendant Siasconset. IHSV's operating agreement named Bennion and Wood as managers. Dkt. 16, ex. 2. For her work as manager, Bennion was to be paid $150.00 an hour.

On May 1, 2011, IHSV and MVH entered into an exclusive contract in accordance with Bennion's proposal. Under the contract, IHSV would receive seventy percent of the insurance revenue, and MVH would retain the remaining thirty percent. In the months that followed, IHSV prospered. It grew a large client base and generated a significant stream of revenue.

When they learned exactly how much revenue IHSV had been generating, Adamson, Wood, and Tolman decided to oust Bennion from IHSV. On August 10, 2011, Wood flew to Boise to meet with Bennion. Because MVH had not paid IHSV the revenue it was owed under the contract, IHSV needed a cash infusion from its members. Wood informed Bennion that Adamson had offered to cover Northwest Osteo's half of the contribution ($15,000) in exchange for an ownership interest in IHSV. Bennion declined the offer.

The following month, Wood sent a "management agreement" to Bennion. Under the agreement, Bennion would be removed as manager of IHSV and replaced by personnel from a management corporation controlled by Adamson, Wood, and Tolman.

Initially, Bennion refused to sign the agreement. Bennion's refusal prompted from Adamson a profanity-laced tirade, during which Adamson threatened to fire Bennion from her position as director of government affairs for MVH, terminate the contract between IHSV and MVH, and destroy Bennion's professional reputation unless she signed the management agreement. Additionally, Adamson accused Bennion of misusing MVH funds for personal purposes, which Bennion later disproved. Feeling scared and trapped, Bennion submitted to Adamson's demands and resigned her position as co-manager of IHSV on September 26, 2011.

Following Bennion's resignation, Woods offered to purchase eighty-five percent of Northwest Osteo's ownership interest in IHSV. Bennion again refused.

Presumably because they could not buy out Bennion's interest in IHSV, defendants began an alternate plan of action. On November 17, 2011, Wood created a Delaware limited liability corporation called Preventative Health, LLC[2] to replace IHSV as MVH's partner offering health screening services and vaccinations in Idaho. Preventative Health operated with the benefit of IHSV's misappropriated business model, client base, and trade secrets. Additionally, Preventative Health recruited several IHSV employees, who were promised they would "continue working with [the] current Team . . . in place under [IHSV]." *First Am. Compl.*, dkt. 28, ¶ 43. In February 2012, Wood created Wellness Screenings, LLC, whose membership is comprised of Preventative

---

[2] Three days before Wood formed Preventative Health, LLC, in Delaware, Bennion formed three Idaho limited liability corporations. One of these corporations is also named Preventative Health, LLC. Unless otherwise noted, the Court uses Preventative Health to refer to the Delaware LLC formed by Wood.

Health.  Since that time, Wellness Screenings took over for Preventative Health as MVH's partner offering preventative health services in Idaho.

Furthermore, MVH withheld the insurance proceeds owed to IHSV under the May 2011 contract.  Although MVH paid $84,268.00 to IHSV, Bennion estimates that MVH is still owed hundreds of thousands of dollars for services that IHSV had performed.  IHSV is currently unable to provide a more precise figure because MVH has with not provided IHSV with accurate billing records.

In their amended complaint, Plaintiffs allege that Defendants' actions violated RICO and various Idaho laws.  Currently, Defendants challenge the sufficiency of Plaintiffs' RICO claims under Federal Rule of Civil Procedure 12(b)(6) and move to dismiss the remaining state causes of action without prejudice.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964 (2007).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570.  A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557.

The Supreme Court identified two "working principles" that underlie Twombly in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the court need not accept as true, legal conclusions that are couched as factual allegations. *Id.* Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. Second, to survive a motion to dismiss, a complaint must state a plausible claim for relief. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## DISCUSSION

To establish civil liability under RICO, Plaintiffs must allege facts that show Defendants violated a provision of 18 U.S.C. § 1962. 18 U.S.C. § 1964(c); *Turner, M.D., v. Cook*, 362 F.3d 1219, 1228 (9th Cir. 2004). The relevant provisions at issue here are § 1962(c), which prohibits the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985), and § 1962(d), which prohibits conspiracy to violate § 1962's substantive provisions.

**1. § 1962(c)**

RICO defines "racketeering activity" to mean "'any act or threat involving' specified state-law crimes, and any 'act' indictable under various specified federal statutes, and certain federal offenses." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989) (quoting 18 U.S.C. § 1961(1)). The specified statutes and offenses include extortion and wire fraud. § 1961(1). Plaintiffs allege that the tactics Adamson employed to force Bennion from her management position in IHSV constituted extortion. Plaintiffs further allege that Defendants committed wire fraud when they made multiple fraudulent representations to "drive out . . . Bennion as part owner of [IHSV] and seize control of the substantial profits" IHSV was generating. *Pls.' Opp'n Memo.*, dkt. 20, at 2. Specifically, Plaintiffs allege that Defendants misrepresented that:

- Adamson was not an owner of IHSV's corporate members;
- MVH possessed the knowledge, expertise, and staff to bill preventative healthcare screenings in accordance with the ACA;
- IHSV would be promptly compensated for its work;
- IHSV would receive monthly billing statements from MVH;
- IHSV corporate books would be kept in Boise, Idaho, and not Portland, Oregon;
- two employees that IHSV hired at Adamson's urging would be neutral, loyal employees to IHSV, when they were actually loyal to Adamson;

- one of these employees would enter into a noncompete agreement with IHSV; and

- Bennion would be compensated for her work as manager of IHSV. *See First Am. Compl.*, dkt 28, ¶76.

Defendants attack Plaintiffs' § 1962(c) claim on several grounds, arguing that the alleged misrepresentations and extortion do not amount to crimes and, therefore, are not racketeering activity; that the misrepresentations did not cause Plaintiffs' injuries; and that the predicate acts of racketeering activity do not constitute a pattern. The Court agrees with Defendants' final contention.

To establish a pattern of racketeering activity, RICO requires "at least two acts of racketeering activity" occurring within ten years of each other. 18 U.S.C. § 1961(5). However, in *Sedima*, the Court explained that this is a minimum requirement, and in most cases proof of more than two acts is required. 473 U.S. at 497 n.14. A pattern emerges, the Court went on, when there is a relationship between the predicate acts and continuity. *Id.* In *H.J. Inc. v. Nw. Bell Tel. Co.*, the Court clarified that such a relationship exists if the predicates "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). "'Continuity' is both a closed- and open-ended concept." *Id.* at 241. "To satisfy the continuity requirement, Plaintiffs must prove either 'a series of related predicates extending over a substantial period of time, i.e., closed-ended continuity, or 'past conduct

that by its nature projects into the future with a threat of repetition, i.e., open-ended continuity,'" *Howard v. Am. Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) (quoting *H.J.*, 492 U.S. at 241, 242) (brackets & internal citations omitted). Determining whether a series of events constitutes a RICO pattern is not a formulaic endeavor. Rather, Congress meant for courts to take a "natural and commonsense approach." *H.J.*, 492 U.S. at 237.

Defendants do not challenge the relatedness of Plaintiffs' allegations. Rather they argue that Plaintiffs have failed to allege facts establishing the continuity prong of a RICO pattern. As to close-ended continuity, Defendants argue that the outermost timeframe in which acts occurred is March 2011, when Bennion first approached Adamson, to February 2012, when Wellness Screenings became MVH's partner in Idaho. They further argue that a more reasonable time starting point is August 2011, because that is when Plaintiffs allege that relationship between IHSV and Bennion, on the one hand, and MVH and Adamson, on the other, began to deteriorate. Plaintiffs' argument in its entirety is that an eleven-month timeframe—March 2011 to February 2012—establishes close-ended continuity. The Court concludes that the Defendants have the correct argument

Close-ended continuity requires Plaintiffs to establish that Defendants conduct persisted over a "substantial period." *Id.* at 242. While conduct spanning a year is generally sufficient, *see Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995), that is not always the case, *see, e.g., Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 19 (1st Cir. 2000) (concluding that 21 fraudulent mailings, sent over 21 month period, aimed at

squeezing the plaintiffs out of their partnership interest did not establish close-ended continuity). The Court must look to all the relevant facts to determine if Plaintiffs allege the long-term criminal activity that Congress intended RICO to target.

According to the complaint, Defendants "began their attempts to force Bennion out" after they learned how much money IHSV was generating, in August 2011. *Am. Compl.*, dkt. 28, ¶ 31. Before that time, the complaint describes innocent events, such as Bennion approaching Adamson with her business plan and the formation of IHSV. While these acts set the stage for Defendants' alleged crimes, Plaintiffs do not allege that Defendants intended to defraud Plaintiffs between March and August 2011. To the contrary, Plaintiffs' arguments in opposition suggest that the relevant time frame may have started even after August. The events that Plaintiffs argue establish Defendants intent to deceive and causation occurred in the fall of 2011, while Defendants were creating Preventative Health. *See Pls.' Oppo. Mem.*, dkt 33, at 4-5. Although Plaintiffs are entitled to all reasonable, favorable inferences at this stage in the proceedings, the Court is not required to accept a longer timeframe than the complaint supports. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("[T]he court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").

Properly read, the complaint shows that August 2011 to February 2012 is the relevant timeframe. Approximately seven months is generally considered too short a period to establish close-ended continuity. *See H.J.*, 492 U.S. at 242 ("Predicate acts

extending over a few weeks or months and threatening no future criminal conduct do not satisfy" close-ended continuity); *Howard*, 208 F.3d at 750 (same); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) ("We have found no case in which a court has held the requirement to be satisfied by a pattern of activity lasting less than a year.").

Although continuity is "centrally a temporal concept," *H.J.*, 492 U.S. at 242, duration is not the only factor that suggests Plaintiffs' allegations fall short in this case. In addition, Defendants' aim was limited in scope—seizing control of IHSV's profits. Defendants accomplished that goal when Preventative Health, through the misappropriated of IHSV's trade secrets, replaced IHSV as MVH's partner in Idaho. "[T]he finite nature of the racketeering activities alleged here, together with their occurrence over a relatively modest period of time, cannot . . . support a . . . finding of a RICO pattern under the 'closed' continuity approach." *Efron*, 223 F.3d at 19; *see also id.* (concluding that 21 fraudulent mailings, sent over 21 month period, aimed at squeezing the plaintiffs out of their partnership interest did not establish close-ended continuity); *Turner*, 362 F.3d at 1229 ("[A]n alleged series of related predicates not extending over a substantial period of time and not threatening . . . future criminal conduct fails to charge closed-ended continuity.") (internal quotation marks omitted); *Religious Tech. Ctr.*, 833 F.2d at 366 ("Since the only goal of the Greene defendants was the successful prosecution of the *Wollersheim* state tort suit, there was no threat of activity continuing beyond the conclusion of that suit."); *Medallion Television Enters. v. SelecTV of Cal.,*

*Inc.*, 833 F.2d 1360, 1363-64 (9th Cir. 1988) (threat of continuing criminal activity was absent in a single scheme to obtain broadcast rights).

Plaintiffs dispute that Defendants predicate acts ended when Preventative Health misappropriated IHSV's trade secrets. Instead, they argue that Defendants subsequent use of IHSV's trade secrets created ongoing economic injury, thereby establishing open-ended continuity. In support of their argument, Plaintiffs rely on *General Motors Corp. v. Ingacio Lopex De Arriortua*, 948 F. Supp. 670 (E.D. Mich. 1996). There, the District Court for the Eastern District of Michigan held that each unlawful use of the plaintiffs' misappropriated trade secrets constituted a new predicate act under RICO. *Id.* at 679. The Eastern District reasoned that "the thief who steals a trade secret victimizes the owner every time the trade secret is used because the owner suffers a new loss with each use of the secret." *Id.*

The Court respectfully disagrees with the approach taken by the Eastern District. First, it runs counter to the way the vast majority of jurisdictions treat the continuous unlawful use of a trade secret. Forty-seven states and the District of Columbia follow the Uniform Trade Secrets Act.[3] Under that act, "a continuing misappropriation constitutes a single claim," Uniform Trade Secrets Act § 6 (1985), with only the "potential [for] damages encompassed by a continuing misappropriation claim . . . expand[ing] with each illicit use or disclosure of the trade secret," *Cadence Design Systems, Inc. v. Avant! Corp.*, 57 P.3d 647, 654 (Cal. 2002); *see also Monolith Portland Midwest Co. v. Kaiser*

---

[3] *See Legislative Fact Sheet - Trade Secrets Act*, Uniform Law Commission, available at http://www.uniformlaws.org/LegislativeFactSheet.aspx?title=Trade%20Secrets%20Act.

*Aluminum & Chemical Corp.*, 407 F.2d 288, 293 (9th Cir. 1969) ("The fabric of the relationship [protected by the tort] once rent is not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated."). *But see Underwater Storage, Inc. v. U.S. Rubber Co.*, 371 F.2d 950, 955 (D.C. Cir. 1966) ("It is the continuing use of another's secret, wrongfully obtained, or used after knowledge that it has been wrongfully obtained, that makes the tort a continuing one.").

Second, the Court agrees with the District Court for the Middle District of Pennsylvania that "using trade secrets is quite different from the initial act of stealing them." *Binary Semantic Ltd. v. Minitab, Inc.*, No. 4:07-CV-1750, 2008 WL 763575, at *4 (M.D. Pa. March 20, 2008). The harm may continue, but the theft or fraud ceases once the trade secret is obtained. RICO is concerned with the repetition of criminal acts, not "provid[ing] a federal cause of action and treble damages to every tort plaintiff." *Oscar v. Univ. Students Coop. Assn.*, 965 F.2d 783, 786 (9th Cir.1992) (en banc) *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir.2005) (per curiam) (en banc); *see also Binary Semantic*, 2008 WL 763575, at *4 ("[T]he theft of trade secrets necessarily implies that they will be used. Therefore, under plaintiff's theory, every misappropriation of trade secrets could result in a RICO claim. This would surely expand the scope of the statute beyond what it was intended to reach."). For these reasons, the Court concludes that Plaintiffs have failed to plead a pattern of racketeering activity.

2.  § 1962(d)

To state a claim for RICO conspiracy, Plaintiffs must allege facts "which, if completed, would satisfy all of the elements of a substantive [RICO] offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Because Plaintiffs allegations do not make out a violation of § 1962(c), their conspiracy claim fails as well. *See Howard*, 208 F.3d at 751 (affirming the dismissal of the plaintiffs' RICO conspiracy claim after they failed to allege a pattern of RICO activity under § 1962(c)); *Religious Tech. Ctr.*, 971 F.2d at 367 n.8 (same).

## CONCLUSION

The Court concludes that the alleged fraud and extortion Defendants employed to oust Bennion and replace IHSV do not establish a pattern of racketeering activity. As a result, Plaintiffs RICO claims will be dismissed with prejudice. Plaintiffs do not argue that they could amend their complaint again to plead additional predicate acts. Nor do Plaintiffs ask the Court to retain jurisdiction over their remaining state law claims. Therefore, the Court will dismiss those claims without prejudice.

## ORDER

**IT IS ORDERED THAT:**

1. Defendants Motion to Dismiss (dkt. 31) is **GRANTED**.

DATED: October 2, 2014



_____
B. Lynn Winmill
Chief Judge
United States District Court

MEMORANDUM DECISION AND ORDER - 16